U.S. District Court } ss
Eastern District of Wis.
I hereby certify that this is a true and correct copy of the original now remaining of record in my office.
NANCY JOSEPH
U.S. Magistrate Judge
DATED: 10/27/17
By:
By: Deputy Clerk

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: <br><br> A light blue Honda vehicle with Wisconsin license plate 710ZXS and VIN 3HGCM56334G709511 | ) <br> ) <br> ) Case No. 17-958 M (NJ) <br> ) <br> ) <br> ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Melissa A. Fus*
Applicant's signature

Melissa A. Fus, Special Agent
Printed Name and Title

Sworn to before me and signed in my presence:

Date: October 27, 2017

*Nancy Joseph*
Judge's signature

City and State: Milwaukee, Wisconsin    The Honorable Nancy Joseph, U.S. Magistrate Judge
Printed Name and Title

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Melissa A. Fus, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1. I am employed as a Special Agent for the State of Wisconsin Department of Justice, Division of Criminal Investigation and I am federally deputized by the Federal Bureau of Investigation. I have been a law enforcement officer for more than 14 years and I am currently assigned to the Human Trafficking Task Force.

2. I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking

1

and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

3. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

4. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

5. Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

II. **PURPOSE OF AFFIDAVIT**

6. This affidavit is submitted in support of applications for search warrants to seek evidence of conspiracy to distribute cocaine in violation of Title 21, United States

2

Code, Sections 841(a)(1), 841(b)(1)(A) and 846, and for the following locations associated with suspects who have committed, are committing, and will continue to commit the above-listed offenses:

> **4777 N. 70th Street, Milwaukee Wisconsin** is the upper unit of a two-story duplex. The duplex is constructed of a tan brick, with a common entrance on the east side of the residence. The entrance is a decorative steel gate door. The numbers 4777 are affixed to the north side of the common entrance.
>
> **A light blue Honda vehicle with Wisconsin license plate 710ZXS and VIN 3HGCM56334G709511**

## II.   PROBABLE CAUSE

7.     Since November of 2015, special agents from the Wisconsin Department of Justice, Division of Criminal Investigation, have been conducting an investigation regarding the trafficking of large quantities of cocaine and crack cocaine in the Milwaukee area, which has been sourced from the Los Angeles, California area.

8.     In July of 2017, case agents met with a Confidential Source (CS #1). CS #1 admitted to selling substantial amounts of cocaine in the Milwaukee area since the summer of 2015. CS #1 stated that his/her sources of cocaine were from California and that CS #1 and his/her co-conspirators traveled out to California to obtain kilograms of cocaine from the sources of supply on more than 5 occasions and on each occasion they would obtain between 2-4 kilograms of cocaine. CS #1 stated that s/he and his/her coconspirators in Wisconsin would typically rent a "Sprinter" type multiple passenger van and travel to California to pick up kilograms of cocaine. Additionally, on several occasions the California source of supply would travel to Wisconsin or send a courier to Wisconsin to deliver the kilograms of cocaine. Since 2015, CS #1 estimated that s/he had

3

purchased approximately 20-30 kilograms of cocaine from his/her California source of supply. CS #1 stated that his/her California sources of supply would charge $30,000 - $33,000 per kilogram of cocaine and some of the kilograms of cocaine would be fronted. CS #1 stated that the last time s/he was in California to obtain kilograms of cocaine from the source of supply was on April 20, 2017, which was corroborated by airline records and phone location data.

9. CS #1 also stated that when s/he first met the California source of supply in the summer of 2015, the source of supply was present in Wisconsin selling cocaine. CS #1 stated that his California sources are nicknamed "G" and "H." CS #1 positively identified Marlon Jamir SIMON (B/M, DOB: 07/15/1984) as the individual s/he knew as "G." CS #1 stated that "H's" real first name could possibly be "Harvey" or "Henry" and described "H" as being a black male 50-52 years old, 5'10" with a slim build and who drives a Cadillac SUV. CS #1 stated that "G" and "H" were associated with Blood Street Gang Members in California. Case agents subsequently identified "H" as Harvey R. HIXON (B/M, DOB: 01/27/1961) and CS #1 positively identified Harvey R. HIXON as the individual s/he knew as "H."

10. CS #1 stated that in the summer of 2015 during a trip to California to obtain kilograms of cocaine, SIMON instructed CS #1 to contact him on telephone number 747-243-1221. Since that time, CS #1 has been contacting SIMON on 747-243-1221 to obtain kilograms of cocaine. At that meeting, SIMON and HIXON also provided CS #1 with a flip phone with a California phone number, which area code 747, and SIMON and HIXON also obtained a flip phone with a Milwaukee phone number, with the 414 area

4

code. CS #1 stated in order to contact SIMON or HIXON s/he would call SIMON and "H's" Milwaukee number and hang up. CS #1 stated that his/her calling of the Milwaukee number flip phone was the signal for SIMON or HIXON to call CS #1's California number 747-243-1221. CS #1 stated that s/he would not speak to SIMON or HIXON on the Milwaukee area code (414 area code number), but rather using the Milwaukee area code number was simply a way to give the appearance of a local phone call and attempt to evade law enforcement because no out of state numbers would appear on CS #1's telephone records. CS #1 stated that when s/he needed cocaine CS #1 would call the "414" number hang up and then call phone number 747-243-1221 from the California flip phone and state "It's a jungle out there" during the course of the conversation with "G" (SIMON) or "H" (HIXON). CS #1 stated that this phrase was the code that CS #1 and his coconspirators in Milwaukee were out of cocaine and needed another shipment of cocaine from SIMON and HIXON.

11. For several reasons, case agents believe that CS #1 is reliable and credible. First, CS #1 has been providing continuous information since July of 2017. Second, the information CS #1 has provided is substantially against CS #1's penal interest. Third, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information has been corroborated through independent investigation, including through surveillance and law enforcement reports. For example, CS #1 informed case agents of travel to California on numerous occasions, which was corroborated through subpoenaed rental car records, airline records, electronic surveillance, and confidential

5

source reporting. CS #1 has felony convictions for possession of a controlled substance, possession of THC, battery, possession with intent to deliver cocaine, and second or subsequent possession of THC, and fleeing and eluding officers. CS #1 is cooperating for consideration on potential federal drug trafficking charges. Finally, CS #1 has had an adequate opportunity to observe directly the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents consider CS #1 to be reliable.

12. In July of 2017, acting under the direction and supervision of case agents, CS #1 placed a recorded call to HIXON on telephone number 747-243-1221. During the conversation, CS #1 explained to HIXON that they still had cocaine left and they would call HIXON when they were ready to get more. CS #1 also expressed to HIXON that the next shipment of cocaine had to be of good quality because they were having a hard time selling the current shipment of cocaine because it was not good quality. HIXON indicated that they would work it out. CS #1 indicated to HIXON that at some point CS #1 wanted to come and visit (in Los Angeles). HIXON indicated that CS #1 should come and visit.

13. In September of 2017, CS #1, acting under the direction and control of case agents, placed a series of recorded calls to HIXON at 747-243-1221. CS #1 was able to make contact with HIXON and they had a discussions concerning the quality of past cocaine shipments. CS #1 also indicated to HIXON that s/he had located a different supplier and HIXON asked CS #1 what he could do to fix things and indicated that he

6

would be willing to lower his prices if necessary. CS #1 indicated that he would travel to California so they could discuss things in person.

14. In July of 2017, agents interviewed CS #2. CS #2 admitted to trafficking substantial amounts of cocaine in the Milwaukee area for about a year and half. CS #2 identified the 1,847 grams of cocaine recovered during a search warrant of his/her residence as being cocaine purchased from his California suppliers. CS #2 stated that s/he was supplied cocaine by individuals from California and further stated that the suppliers would bring the cocaine directly Milwaukee and sometimes CS #2 would travel to California and pick it up. CS #2 stated that he knows the suppliers by the nicknames of "G" and "H." CS #2 positively identified Marlon Jamir SIMON (b/m, DOB: 07/15/1984) as being the individual s/he knows as "G." CS #2 described "H" as being an older black male, 50 years old, 5'8"-5'10," short hair, 200 lbs.

15. CS #2 stated the first time SIMON and HIXON sold cocaine to CS #2 and his/her coconspirator, s/he was not present during the actual transaction but was outside of a residence near 73rd and Center. CS #2 stated that his co-conspirator conducted the transaction and the cocaine was then brought to CS #2's residence. CS #2 stated after this initial deal in Milwaukee CS #2 and his co-conspirator would purchase cocaine from SIMON or HIXON approximately every 2 ½ months. CS #2 stated that each purchase would be at least 2 kilograms.

16. CS #2 stated that when the cocaine shipments were delivered to Milwaukee, SIMON and HIXON would send a courier to deliver the cocaine and each time the courier would arrive in an Uber. CS #2 stated that the last time CS #2 received

7

cocaine from SIMON and HIXON was in June of 2017 and that they had received approximately 1.5 kilograms of cocaine for approximately $49,500. CS #2 stated that the courier arrived at his residence in Milwaukee in an Uber and he paid the driver of the Uber $240. CS #2 stated that the courier brought the cocaine inside of the residence in a large backpack. CS #2 stated that they gave the courier a portion of the money for the transaction. CS #2 stated that s/he and his/her co-conspirator deposited the rest of the money into Wells Fargo accounts. CS #2 stated that SIMON and HIXON provided CS #2 with the names and account numbers to make the deposits. CS #2 stated that s/he conducted a couple of deposits for payment and then stopped because CS #2 was afraid s/he might get caught.

17. CS #2 stated that s/he and his/her coconspirators travelled to California on 5 to 6 occasions to pick up cocaine from California. CS #2 stated that they would pick up 1-5 kilograms of cocaine on each trip. CS #2 stated that when they purchased cocaine SIMON and HIXON would front some of the cocaine, s/he would pay SIMON, and HIXON the balance after CS #2 and his coconspirators in Wisconsin sold all of the cocaine. CS #2 stated that when CS #2 received the cocaine s/he would break it down to ounce, half-ounce, or one-eighth of an ounce quantities. CS #2 stated that s/he and his/her coconspirator would typically pay $33,000 per kilogram. CS #2 stated when they were running low on cocaine CS #2's coconspirator would call the supplier and tell him, "It's a jungle out there," which meant that they were ready to be re-supplied with cocaine. CS #2 stated that s/he did not know SIMON or HIXON's phone numbers.

8

18. For several reasons, case agents believe that CS #2 is reliable and credible. First, CS #2 has been providing continuous information since July of 2017. Second, the information provided by CS #2 is consistent with evidence obtained elsewhere in this investigation where CS #2 was not utilized, and substantial portions of CS #2's information has been corroborated through independent investigation, including through surveillance and law enforcement reports. For example, CS #2 informed case agents of travel to California, which was corroborated by subpoenaed rental car records and electronic surveillance. For example, CS #2 also provided case agents with banking deposit information at banks, which was corroborated by bank records. CS #2 has felony convictions for delivery of cocaine and delivery of marijuana. CS #2 is cooperating for consideration on potential federal drug trafficking charges. For these reasons, case agents consider CS #2 to be reliable.

19. On September 20, 2017, case agents obtained a search warrant to obtain location information for HIXON's phone, 747-243-1221. In September of 2017, acting under the direction and supervision of case agents, CS #1 traveled to Los Angeles, California area to arrange to meet with HIXON regarding their drug distribution relationship, including future purchases of kilograms of cocaine. CS #1 placed recorded calls to HIXON at phone number 747-243-1221 and 414-213-0475 to arrange for the meeting with "H." Case agents reviewing the location information for HIXON's phone, 747-243-1221, revealed that the phone was initially located in the area 8328 Topeka Drive, Northridge, CA. As HIXON traveled closer and closer the meet location, case agents observed corresponding location information for the 747-243-1221 phone number.

9

HIXON arrived at the pre-arranged meet location in a gray Toyota Prius with California plate# 5PLS318. Case agents conducted a check with the California Department of Transportation regarding plate 5PLS318, which revealed that the vehicle listed to Ahlexhys Hixon of 8437 Cedros Avenue, #107, Panorama City, CA.

20. During the course of the meeting, which was audio and video recorded, HIXON stated that the poor quality cocaine was obtained by others and that in the future, HIXON would check the quality of cocaine before distributing it to CS #1. HIXON further stated that, when the "boat" arrived, HIXON's paper would get mixed up with the other paper, referring to the cocaine. CS #1 complained to HIXON about the quality of cocaine and stated that s/he and CS #2 could go elsewhere (referring to Chicago) for the cocaine and that obtaining the cocaine was not a problem. CS #1 discussed high prices and HIXON stated that he could lower the prices. During the course of the conversation, HIXON handed CS #1 a plastic bag containing a sample of cocaine and CS #1 stated that the cocaine sample looked nothing like the previous cocaine obtained from HIXON. During the conversation, CS #1 also mentioned "Valentine's Day," which was a reference to a bad shipment of cocaine. HIXON took responsibility for the poor quality of cocaine and HIXON told CS #1 that he had checked it and that it looked good. CS #1 stated that s/he and CS #2 was looking for "good work," referring to the trafficking of good quality of cocaine. CS #1 complained about the taste of the cocaine and described how cocaine customers would complain about the taste. HIXON stated he never heard about drug users complaining about taste and HIXON acknowledged that after checking the cocaine, some of the cocaine sold to CS #1 was "fucked up." During the meeting with

HIXON, CS #1 called CS #2 and s/he also spoke with HIXON. CS #2 and HIXON spoke about the quality of cocaine and past cocaine transactions. HIXON explained that the last delivery of cocaine was a "rush job." CS #1 informed CS #2 that HIXON provided a sample that looked good.

21. HIXON mentioned that the previous night HIXON had spoken to SIMON in attempts to meet up the next day with HIXON and CS #1. HIXON also discussed how to transport the cocaine to CS #1. CS #1 discussed drug trafficking methods deployed by SIMON in the past. CS #1 further stated that HIXON provided him/her with a cellular phone bearing phone number 626-549-9786. HIXON told CS #1 that he was going to turn off phone number 747-243-1221 and that his new number is 626-455-8029. HIXON stated that CS #1 should call 626-455-8029 when CS #1 is ready to conduct business. CS #1 told HIXON that s/he would call him when s/he was ready to receive the next shipment of cocaine.

22. Case agents met with CS #1 who turned over the sample of cocaine received from "H." Case agents subjected a sample of the cocaine to the Nark II Field test and received a positive result for cocaine base. Case agents received a weight of approximately 1.0 grams with packaging materials.

23. In early October of 2017, CS #1, acting under the direction and control of case agents, placed a recorded call to HIXON and during this case, CS #1 stated, in coded language, that s/he was ready to receive another cocaine shipment from HIXON and SIMON. CS #1 spoke with HIXON regarding the status of the cocaine shipment and HIXON indicated that he was waiting on "G" (SIMON) to obtain the cocaine. On October

11

21, 2017, CS #1 received a phone call from HIXON on 414-213-0475. HIXON indicated to CS #1 that the shipment of cocaine would arrive in Wisconsin on Monday or Tuesday (October 23 or 24) and that he would probably be in Wisconsin on Monday or Tuesday. During the call, HIXON asked CS #1 if he had enough money for three (referring to 3 kilograms of cocaine). CS #1 told HIXON that he had enough for 3 kilograms of cocaine. HIXON indicated that he would front the fourth kilogram to CS #1. HIXON advised CS #1 that the phone he gave him (626-455-8029) was off but he paid the bill and it should be back on. HIXON advised CS #1 that s/he should keep the phone with him/her because he will call soon with additional details.

24. On October 26, 2017, CS #1 received a call from HIXON regarding the shipment of cocaine. CS #1 and HIXON asked if CS #1 had converted the money into larger bills so it would be easier to handle. HIXON stated that the cocaine shipment would probably arrive in Milwaukee on Saturday (October 28). HIXON stated that CS #1 should not have the money on hand until tomorrow Friday (October 27).

25. On October 27, 2017 at approximately 3:30 p.m., CS #1 received a phone call from HIXON stating that the cocaine shipment was with an individual CS #1 knows as "cousin Twain." CS #1 had prior contacts with "cousin Twain" and identified him as Antoine Williams. CS #1 indicated that Williams resided in a tan residence on the corner located at N. 70th Street and W. Hampton Avenue, in the City of Milwaukee. CS #1 showed case agents a photograph of Antoine Williams from Instragram and case agents compared the picture to the WI Department of Transportation photograph of Antoine L.

12

Williams (M/B, 08-21-1984) and confirmed it was the same subject. The address listed on Williams' driver's license was 4777 N. 70th Street, Milwaukee, WI.

26. CS #1 subsequently received a call from HIXON and HIXON stated that "cousin Twain" was currently in the area of "70th and Hampton" and HIXON would advise when "cousin Twain" was en route to CS #1's location.

27. Case agents established surveillance at the residence located at 4777 N. 70th Street. At approximately 4:30 p.m., case agents observed a male black subject exit the east door of the residence at 4777 N. 70th St and enter the driver's side door of a white Chevrolet Malibu with IL license plate of AK15098, which was parked to the east of the residence. At approximately the same time, CS #1 received a phone call from HIXON indicating that "cousin Twain" was en route to his location. At approximately, 5:10 p.m., a white Chevrolet Malibu with IL license plate of AK15098 drove north past the location of CS #1, that is, the meet location. As the vehicle drove past slowly, CS #1 was on the phone with HIXON who indicated that "cousin Twain" was at the meet location. The white Malibu then continued driving northbound past the meet location. Surveillance units then followed the white Malibu. At approximately 5:20 p.m., Milwaukee Police Department marked units attempted to stop the white Malibu with IL license plate of AK15098, in the 2700 block of Elder Wallis Street. The suspect vehicle fled from the marked police vehicles. The vehicle was then recovered in the 3604 N. 37th Street, in the City of Milwaukee.

28. The white Malibu with IL AK15098 vehicle was abandoned. The driver's door was unlocked with valuables inside to include a cell phone. A search of the vehicle

13

resulted in locating a Glock pistol with extended magazine, various paperwork, and receipts with the name of Antonie L. Williams. Included in the paperwork was a receipt, dated October 24, 2017, for Regent Mini Storage.

29. Case agents maintained surveillance on the residence located at 4777 N. 70th Street. Case agents observed a light blue Honda sedan northbound on N. 70th Street driving at a high rate speed. The vehicle turned into an alley to the south of the residence and case agents then observed a male black subject walking from the location of where the Honda vehicle parked. Case agents recognized the subject to be Antoine L. Williams and case agents identified themselves as police and ordered Williams to stop. Williams then fled on foot. During the foot pursuit, case agents observed Williams drop keys to the Honda vehicle, a cell phone, and house keys. Upon arresting Williams, case agents recovered a substantial amount of cash and a WI Identification card from his person. The light blue Honda vehicle had WI license plate of 710ZXS and VIN 3HGCM56334G709511. Williams' keys on his person were for 4777 N. 70th Street. The residence located at **4777 N. 70th Street** and the **light blue Honda vehicle with Wisconsin license plate 710ZXS and VIN 3HGCM56334G709511** were then secured.

30. Based upon their training and experience and the investigation to date, case agents are aware that drug traffickers commonly maintain evidence of their drug trafficking, including drug ledgers, financial documents, U.S. currency, cellular telephones, customer contact information, jewelry or other items purchased with drug proceeds, in their homes or "stash" houses. Case agents are also aware it is common practice for individuals who are involved in business activities of any nature to maintain

14

books and records of such business activities for lengthy periods of time. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods of time, even several years, based on case agents' training and experience. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

## II.   CONCLUSION

31.    Case agents believe, based on the facts contained within this affidavit, that there is probable cause to believe that the locations described in paragraph 6 and more fully described in Attachment A, have been used as part of the conspiracy to possess with intent to distribute and distribute cocaine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846. Based on the foregoing, there is probable cause to believe that located within the locations described in paragraph 6 above and more fully described in Attachment A, there is evidence of drug trafficking, and proceeds of drug trafficking, all of which are detailed more specifically in Attachment B, Items to be Seized.

## ATTACHMENT A

A light blue Honda vehicle with Wisconsin license plate 710ZXS and VIN 3HGCM56334G709511

4

## ATTACHMENT B
## ITEMS TO BE SEIZED

All records relating to violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, including, but not limited to:

1. Controlled substances, including cocaine or cocaine base; packaging materials for the distribution of controlled substances, including cocaine and cocaine base, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution;

2. Proceeds of drug trafficking activities, including United States Currency, financial instruments, jewelry;

3. Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the transportation, ordering, possession, sale, or distribution of controlled substances;

4. Personal telephone books, keys, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

5. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data;

6. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the prices, quantity, and/or times when controlled substances were obtained transferred or sold distributed, and/or concealed;

7. Documents and deeds reflecting the purchase or lease of real estate, vehicles, jewelry or other items obtained with the proceeds from organized criminal and drug trafficking activities;

8. Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in organized criminal and drug trafficking activities;

9. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents and keys; and

10. Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies